UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PATRICK SCOTT BAKER, et al.,

        Petitioners,

   -against-

NATIONAL BANK OF EGYPT, JPMORGAN
CHASE & CO., JPMORGAN CHASE BANK,
N.A., CITIBANK, N.A., THE BANK OF NEW
YORK MELLON, INTESA SANPAOLO SPA,
and COMMERZBANK AG,

        Respondents.

No. 12 Civ. 7698 (GBD)

---

MEMORANDUM OF LAW OF RESPONDENTS
JPMORGAN CHASE BANK, N.A., JPMORGAN CHASE & CO.,
AND THE BANK OF NEW YORK MELLON IN OPPOSITION TO
PETITIONERS' MOTION FOR TURNOVER OF BLOCKED ASSETS

 

LEVI LUBARSKY FEIGENBAUM &
WEISS LLP
655 Third Avenue, 27th Floor
New York, New York 10017
(212) 308-6100
*Attorneys for Respondents JPMorgan
Chase Bank, N.A., JPMorgan Chase & Co.
and The Bank of New York Mellon*

TABLE OF CONTENTS
Page

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................. 1

THE FACTS RELEVANT TO WHETHER THE BNYM AND
JPMCB BLOCKED ACCOUNTS ARE SUBJECT TO EXECUTION ................................. 4

    A.     The Wire Transfers Underlying the BNYM Blocked Accounts ............................ 5

    B.     The Wire Transfers Underlying the JPMCB Blocked Accounts ........................... 6

ARGUMENT ............................................................................................................................ 6

THE FUNDS IN THE BNYM AND JPMCB BLOCKED ACCOUNTS
CANNOT BE TURNED OVER TO PETITIONERS BECAUSE THE ACCOUNTS
ARE NOT SUBJECT TO EXECUTION UNDER *CALDERON-CARDONA*
AND *HAUSLER* ................................................................................................................... 6

    A.     The BNYM and JPMCB Blocked Accounts Do Not Meet the Requirements
for Execution Established in *Calderon-Cardona* and *Hausler* ............................ 7

    B.     The BNYM and JPMCB Blocked Accounts Are Not Subject to Turnover
Under a Subrogation Theory Premised on U.C.C. Article 4-A-402(5) ................. 9

    C.     That Lebanese Canadian Bank Was a Party to the Wire Transfer Underlying
the Largest of the Blocked Accounts Held by BNY Mellon Is Immaterial
Because That Bank Was Never an Instrumentality of Syria .................................. 13

    D.     This Court Has No Authority to Overrule or Disregard
*Calderon-Cardona* and *Hausler* ......................................................................... 14

CONCLUSION ........................................................................................................................ 16

## TABLE OF AUTHORITIES

| Cases | Page |
|---|---|
| *Calderon-Cardona v. Bank of New York Mellon*, 770 F.3d 993 (2d Cir. 2014), *cert. denied*, No. 14A1175, 2016 WL 207446 (U.S. Jan. 19, 2016) | passim |
| *Consub Del. L.L.C. v. Schahin Eugenharia Limitada*, 676 F. Supp. 2d 162 (S.D.N.Y. 2009) | 12 |
| *Export-Import Bank of U.S. v. Asia Pulp & Paper Co.*, 609 F.2d 111 (2d Cir. 2010) | 7, 11 |
| *Grain Traders, Inc. v. Citibank, N.A.*, 160 F.3d 97 (2d Cir. 1998) | 12 |
| *Hausler v. JP Morgan Chase Bank, N.A.*, 740 F. Supp. 2d 525 (S.D.N.Y. 2010) | 10 |
| *Hausler v. JP Morgan Chase Bank, N.A.*, 770 F.3d 207 2d Cir. 2014), *cert. denied sub nom. Hausler v. JPMorgan Chase Bank, N.A.*, No. 14A1180, 2016 WL 207447 (U.S. Jan. 19, 2016) | passim |
| *Hausler v. JPMorgan Chase Bank, N.A.*, 845 F. Supp. 2d 553 (2012) | 8 |
| *Ithaca Coll. v. NLRB*, 623 F.2d 224 (2d Cir. 1980) | 15 |
| *Rubin v. Islamic Republic of Iran*, 637 F.3d 783 (7th Cir. 2011) | 10 |
| *Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58 (2d Cir. 2009) | passim |
| *Thurman v. Bun Bun Music*, No. 13 Civ. 5194(CM)(MHD), 2015 WL 2168134 (S.D.N.Y. May 7, 2015) | 13 n.7 |

*United States v. Kaczowski*,
  114 F. Supp. 2d 143 (W.D.N.Y. 2000) .................................................................................. 15

*Walters v. Indus. & Commercial Bank of China, Ltd.*,
  651 F.3d 280 (2d Cir. 2011) ................................................................................................. 10


Statutes and Rules

28 U.S.C. § 1605(A) ................................................................................................................ 2 n.2

28 U.S.C. § 1610(g) ................................................................................................................ passim

28 U.S.C. § 1603(b)(2) ........................................................................................................... 5 & n.5

31 C.F.R. Part 542 ................................................................................................................... 1

N.Y. U.C.C. Article 4-A ................................................................................................. 3, 8, 13

N.Y. U.C.C. Article 4-A-402(3)-(4) ....................................................................................... 9

N.Y. U.C.C. Article 4-A-402(5) ................................................................................... 9, 11, 12

Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, § 201(a),
  116 Stat. 2322 (28 U.S.C. § 1610 note) ........................................................................... passim


Other Authorities

Statement of Interest of the United States of America,
  *Calderon-Cardona v. Deutsche Bank Trust Co. Americas*,
  No. 11 Civ. 03288 (DLC) (S.D.N.Y.) (ECF No. 90). ....................................................... 10 n. 6

Respondents JPMorgan Chase & Co., JPMorgan Chase Bank, N.A. ("JPMCB") and The Bank of New York Mellon ("BNY Mellon") submit this memorandum of law in opposition to the "Motion for Turnover of Blocked EFT Assets" by petitioners Patrick Scott Baker et al. ("Petitioners" or the "Bakers").[1] Respondents Citibank, N.A. ("Citibank") and Intesa Sanpaolo SPA ("Intesa") join in the legal arguments set forth in this memorandum, which they supplement with facts pertinent to those banks contained in separate affidavits filed with this memorandum.

## PRELIMINARY STATEMENT

By their motion, Petitioners, judgment creditors of the Syrian Arab Republic ("Syria) and certain instrumentalities thereof, seek the turnover of seven blocked accounts referred to collectively by Petitioners, and at times here, as the "Disputed Assets." Of those seven blocked accounts, two are maintained by JPMCB (the "JPMCB Blocked Accounts"), two by BNY Mellon (the "BNYM Blocked Accounts"), two by Citibank, and one by Intesa. Each blocked account holds the proceeds of a wire transfer, also known as an electronic funds transfer ("EFT"), that the bank in question blocked in accordance with Syrian sanctions regulations, 31 C.F.R. Part 542, administered by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"). Petitioners seek the turnover of the funds in those accounts to help enforce their judgment against Syria.

At the outset, JPMCB and BNY Mellon express their sympathy for victims of terrorism and emphasize that, as disinterested parties in this action, they have no incentive or desire to impede Petitioners' efforts to enforce their judgment against Syria. JPMCB, in particular, has agreed to turn over to Petitioners one account, blocked under Syrian sanctions regulations, that meets the legal requirements for execution, and in 2014 it turned over more than $80 million in

---

[1] Although JPMorgan Chase & Co. was named as a respondent, it is a holding company that holds no accounts of any kind. The blocked accounts at issue on Petitioners' motion, as it pertains to the JPMorgan entities, are held solely by JPMCB, a subsidiary of JPMorgan Chase & Co.

blocked funds to the Gates parties, another group of Syrian judgment creditors with whom the Bakers had been in litigation to determine which group had priority to those funds. But JPMCB and BNY Mellon must also follow the law, and the governing law in this Circuit, recently established by the Second Circuit, makes clear that the Disputed Assets are not subject to execution under either of the two statutory provisions under which Petitioners seek a turnover: § 201(a) of the Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, 116 Stat. 2322 (reprinted following 28 U.S.C. § 1610) ("TRIA"), and § 1610(g) of the Foreign Sovereign Immunities Act ("FSIA").[2]

Thus, as the Second Circuit held in *Calderon-Cardona v. Bank of New York Mellon*, 770 F.3d 993, 1002 (2d Cir. 2014), *cert. denied*, No. 14A1175, 2016 WL 207446 (U.S. Jan. 19, 2016), and *Hausler v. JP Morgan Chase Bank, N.A.*, 770 F.3d 207, 212 (2d Cir. 2014), *cert. denied sub nom. Hausler v. JPMorgan Chase Bank, N.A.*, No. 14A1180, 2016 WL 207447 (U.S. Jan. 19, 2016), a blocked wire transfer held by an intermediary bank is subject to execution under TRIA § 201 or FSIA § 1610(g), as property of a judgment debtor such as Syria, "only where either the state itself or an agency or instrumentality thereof (such as a state-owned financial institution) transmitted the EFT directly to the bank where the EFT is held pursuant to the block." *Calderon-Cardona*, 770 F.3d at 1002; *see also Hausler*, 770 F.3d at 212. As to each of the JPMCB and BNYM Blocked Accounts, that requirement is not met. As an initial matter, Petitioners make no effort to show that any of the parties to the blocked EFTs underlying the

---

[2] TRIA § 201 states in pertinent part: "[I]n every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism . . . the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment . . . ."

FSIA § 1610(g) states in pertinent part that "the property of a foreign state against which a judgment is entered under [FSIA] section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment."

2

BNYM or JPMCB Blocked Accounts are actually agencies or instrumentalities of Syria, an omission that, by itself, requires that Petitioners' motion be denied. But even assuming the originators were agencies or instrumentalities of Syria, the entities that transmitted the EFTs directly to JPMCB or BNY Mellon are not. For that reason alone, the funds in the four accounts are not subject to execution under TRIA § 201 or FSIA § 1610(g).

Petitioners do not dispute that the entities that directly transmitted to JPMCB or BNY Mellon the EFTs underlying the JPMCB and BNYM Blocked Accounts were not Syrian agencies or instrumentalities. Petitioners instead advance three arguments designed to circumvent *Calderon-Cardona* and *Hausler*: (i) that under the subrogation provisions of Article 4-A of the New York Uniform Commercial Code ("U.C.C."), the Syrian originators of the wire transfers underlying the JPMCB and BNYM Blocked Accounts "plausibly" have a claim to the blocked funds; (ii) that as to the largest of the blocked accounts, held by BNY Mellon, a "reasonable inference" that the account "belongs to a Syrian defendant" may be drawn because the originating bank for the underlying EFT – Lebanese Canadian Bank – became defunct a few years after the EFT was blocked; and (iii) that *Calderon-Cardona* and *Hausler* were in all events "wrongly decided" and should be disregarded or "limited to their facts."

As discussed below, however, none of those arguments provide a basis for turnover under established law. First, the Second Circuit did not recognize, in *Calderon-Cardona* or *Hausler*, U.C.C. Article 4-A's subrogation provisions as a legal basis on which blocked EFTs may be attached. Nor, in all events, is there is any evidence that the originators of the wire transfers underlying the JPMCB and BNYM Blocked Accounts did what is required – identify for the originating bank the specific intermediary bank to use for the wire transfer – to be able to invoke the U.C.C.'s subrogation provisions. Second, the post-EFT status of Lebanese Canadian Bank,

3

which was not an instrumentality of Syria, is irrelevant to whether the blocked EFT as to which it was the originating bank meets the requirements of *Calderon-Cardona* and *Hausler*. Third, this Court has no authority to overrule or disregard the clear holdings of *Calderon-Cardona* or *Hausler*, which undisputedly control here.

## THE FACTS RELEVANT TO WHETHER THE BNYM AND JPMCB BLOCKED ACCOUNTS ARE SUBJECT TO EXECUTION

The facts relevant to JPMCB's and BNY Mellon's opposition to Petitioners' motion are set forth in the accompanying July 22, 2016 declaration of Steven B. Feigenbaum, the banks' lead counsel ("Feigenbaum Decl."). For purposes of the motion, the banks accept as accurate the factual and procedural background set forth in Petitioners' brief (at 2-4) and do not supplement that background here.[3]

Instead, and in light of *Calderon-Cardona* and *Hausler*, JPMCB and BNY Mellon limit their discussion of the facts solely to those that alone are relevant to whether the BNYM and JPMCB Blocked Accounts are subject to execution under TRIA § 201 or FSIA § 1610(g): (i) the identifications of the entities that immediately preceded BNY Mellon or JPMCB, as the intermediary banks, in the wire transfer chains underlying the blocked accounts, and (ii) whether those entities are agencies or instrumentalities of Syria. Those facts are derived from the wire instructions, maintained by the banks, for the EFTs underlying the BNYM and JPMCB Blocked Accounts, as well as from information about the pertinent entities that is available over the internet. (Feigenbaum Decl. ¶¶3-4) The relevant information in the wire instructions is set forth in spreadsheets, prepared for this litigation by JPMCB's and BNY Mellon's respective OFAC-

---

[3] JPMCB and BNY Mellon note, however, that Petitioners state several times in their brief (*e.g.*, at 4) that the Disputed Assets were "blocked by OFAC." That is wrong. The banks, not OFAC, blocked the EFTs at issue. OFAC administers the sanctions programs pursuant to which banks block sanctioned EFTs like those here.

compliance groups and produced to Petitioners, that detail the wire transfers that those banks had blocked under Syrian sanctions regulations as of the time of the spreadsheets.

A.   The Wire Transfers Underlying the BNYM Blocked Accounts

The first BNYM Blocked Account consists of the proceeds of a wire transfer blocked on or about March 30, 2010 in the amount of $1,194,000. The originator of that wire transfer was Syria Duty Free, an entity based in Damascus, Syria. The originator's bank was Lebanese Canadian Bank, which, as noted, was then a Lebanese bank based in Beirut, Lebanon, and whose assets have since been acquired, in whole or in part, by Societe Generale, as Petitioners state in their brief (at 10). Lebanese Canadian Bank immediately preceded BNY Mellon in the wire transfer chain. (Feigenbaum Decl. ¶5; Ex. 1)[4]

The second BNYM Blocked Account consists of the proceeds of a wire transfer blocked on or about April 16, 2010 in the amount of $14,947.50. The originator of that wire transfer was Cham Holding Co. S.A.L., an entity based in Damascus. The originator's bank, referred to in the spreadsheet (as derived from the wire instructions) as "BBASYSYDA," is Bank Audi Syria, S.A. ("Bank Audi"), a Damascus-based subsidiary of a Lebanese banking group. According to information available on the internet, Bank Audi is predominantly or entirely privately owned and is therefore neither an agency nor instrumentality of Syria. See 28 U.S.C. § 1603(b)(2).[5]

---

[4]   References to "Ex. __" are to the exhibits to the Feigenbaum Declaration.

[5]   Section 1603(b) states:

(b) An "agency or instrumentality of a foreign state" means any entity—

(1) which is a separate legal person, corporate or otherwise, and
(2) which is an organ of a foreign state or political subdivision thereof, *or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof*, and
(3) which is neither a citizen of a State of the United States as defined in section 1332 (c) and (e) of this title, nor created under the laws of any third country. [Emphasis added]

Bank Audi immediately preceded BNY Mellon in the wire transfer chain. (Feigenbaum Decl. ¶6; Exs. 1, 3)

B.   The Wire Transfers Underlying the JPMCB Blocked Accounts

The first JPMCB Blocked Account consists of the proceeds of a wire transfer blocked on or about April 5, 2011 in the amount of $30,312.66. The originators of that wire transfer were Ayman Kalai ("Kalai"), who is believed to be a Syrian citizen, and Syrian Telecom and Tech ("STT"), a telecommunications company located in Damascus. The originator's bank was Blom Bank S.A.L. ("Blom Bank"), a Lebanese bank, based in Beirut, that is neither an agency nor instrumentality of Syria. Blom Bank immediately preceded JPMCB in the wire transfer chain. (Feigenbaum Decl. ¶8; Ex. 2)

The second JPMCB Blocked Account consists of the proceeds of a wire transfer blocked on or about August 31, 2011 in the amount of $16,174. The originator of the wire transfer was Ebla Petroleum Company, which is based in Damascus. The originator's bank was Blom Bank, which immediately preceded JPMCB in the wire transfer chain. (Feigenbaum Decl. ¶9; Ex. 2)

ARGUMENT

THE FUNDS IN THE BNYM AND JPMCB
BLOCKED ACCOUNTS CANNOT BE TURNED OVER TO
PETITIONERS BECAUSE THE ACCOUNTS ARE NOT SUBJECT
TO EXECUTION UNDER *CALDERON-CARDONA* AND *HAUSLER*

In *Calderon-Cardona* and *Hausler*, the Second Circuit held that for a blocked EFT to be subject to turnover, the entity that ***immediately*** preceded the bank in the wire transfer chain, and directly transmitted the EFT to the bank, must be an instrumentality of the judgment debtor, here Syria. Here, Petitioners concede that, as to each of the Disputed Assets, the entity immediately preceding the intermediary bank in question was not a Syrian instrumentality. That is the end of

the inquiry under *Calderon-Cardona* and *Hausler*, requiring a determination that none of the Disputed Assets are subject to turnover.

A.  The BNYM and JPMCB Blocked Accounts Do Not Meet the Requirements for Execution Established in *Calderon-Cardona* and *Hausler*

In *Calderon-Cardona*, the Second Circuit, construing FSIA § 1610(g), began its analysis by confirming that "[w]hether attachment of the EFTs under § 1610(g) is possible turns . . . on whether the blocked EFTs at issue are 'property of' [the terrorist state] or 'the property of an agency or instrumentality of' [the terrorist state]." 770 F.3d at 1000. Noting that "Congress has not defined the type of property interests that may be subject to execution under FSIA § 1610(g)," the Court concluded that "state law . . . define[s] the 'rights the [judgment creditor] has in the property the [creditor] seeks to reach.'" *Id.* at 1001 (quoting *Export-Import Bank of U.S. v. Asia Pulp & Paper Co.*, 609 F.2d 111, 117 (2d Cir. 2010)). Applying state law – specifically, U.C.C. Article 4-A – the Second Circuit, citing to its prior decision in *Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58, 71 (2d Cir. 2009), reaffirmed that EFTs "are neither the property of the originator nor the beneficiary while briefly in the possession of an intermediary bank." *Id.* (internal quotation marks and citation omitted). "Because EFTs," the Court stated, "function as a chained series of debits and credits between the originator, the originator's bank, any intermediary banks, the beneficiary's bank, and the beneficiary, 'the only party with a claim against an intermediary bank is the sender to that bank, which is typically the originator's bank.'" *Id.* (quoting *Asia Pulp*, 609 F.2d at 119-20). The Court went on to hold:

> Put another way, . . . the only entity with a property interest in an EFT while it is midstream is the entity immediately preceding the bank 'holding' the EFT in the transaction chain. In the context of a blocked transaction, this means that the only entity with a property interest in the stopped EFT is the entity that passed the EFT on to the bank where it presently rests. We therefore hold that an EFT blocked midstream is

7

'property of a foreign state' or 'the property of an agency or instrumentality of such a state,' subject to attachment under 28 U.S.C. § 1610(g), only where either the state itself or any agency or instrumentality thereof (such as a state-owned financial institution) transmitted the EFT **directly** to the bank where the EFT is held pursuant to the block. *Id.* at 1002 (emphasis added).

Days after rendering its decision in *Calderon-Cardona*, the Second Circuit decided *Hausler*, in which it addressed the related issue of when a judgment debtor has a sufficient interest in a blocked EFT to render it subject to execution under TRIA § 201. The district court in *Hausler* had ordered the blocked EFTs at issue there to be turned over, holding that TRIA preempts U.C.C. Article 4-A and authorizes attachment of blocked EFTs whether or not the blocked funds are owned by the judgment debtors – there, Cuba and various instrumentalities thereof. *See Hausler v. JPMorgan Chase Bank, N.A.*, 845 F. Supp. 2d 553, 562 (2012). The Second Circuit reversed, holding that U.C.C. Article 4-A governed and reiterating that, under Article 4-A, "EFTs are neither the property of the originator nor the beneficiary while briefly in the possession of an intermediary bank." *Hausler*, 770 F.3d at 212 (internal quotation marks and citation omitted).

Consistent with its decision in *Calderon-Cardona*, the Court then held that, for an EFT to be a "blocked asset" of a terrorist state under TRIA § 201, either the terrorist state or an agency or instrumentality thereof must have transmitted the EFT *directly* to the intermediary bank that blocked the transfer. *Id.* There, it was "undisputed that no Cuban entity transmitted any of the blocked EFTs in this case directly to the blocking bank," *id.*, so neither Cuba nor its agents or instrumentalities had a property interest in the blocked EFTs. "Because no terrorist party or agency or instrumentality thereof has a property interest in the EFTs," the Second Circuit concluded, the blocked EFTs "are not attachable under TRIA § 201." *Id.*

8

*Calderon-Cardona* and *Hausler* confirm that neither Syria nor any instrumentalities thereof has a property interest in any of the blocked EFTs underlying the BNYM and JPMCB Blocked Accounts, and that those EFTs are therefore not subject to execution under TRIA § 201 or FSIA § 1610(g). As to each of the four blocked accounts, the entity that directly transmitted the blocked EFT to BNY Mellon or JPMCB was a non-Syrian entity or, in one case, a privately owned Syrian-based affiliate of a Lebanese banking group, and none of those entities is an agency or instrumentality of Syria. Those facts alone dispose of the question of whether the funds in the BNYM and JPMCB Blocked Accounts may be turned over to Petitioners, requiring that Petitioners' motion be denied.

B.  The BNYM and JPMCB Blocked Accounts Are Not Subject to Turnover Under a Subrogation Theory Premised on U.C.C. Article 4-A-402(5)

Recognizing that the Disputed Assets are not subject to execution under *Calderon-Cardona* and *Hausler*, Petitioners seek to circumvent those decisions by relying on the "exception" to the rule, embodied in Article 4-A-402(3)-(4) and a foundation of the Second Circuit's holdings, that an originating bank alone has a claim against an intermediary bank that blocks an EFT midstream. That exception is derived from the subrogation provisions embodied in Article 4-A-402(5), which states that if a wire transfer is not completed and funds cannot be returned by the intermediary bank, "[t]he first sender in the funds transfer that issued an instruction requiring routing through that intermediary bank is subrogated to the right of the bank that paid the intermediary bank to refund as stated in subsection (4)." As put by Petitioners, "[w]hen an originator instructs its originating bank to route the EFT through a particular intermediary bank, the risk of loss *shifts to the originator*, in this case Syria, who then has a direct claim against the intermediary bank." (Petitioners' Br. at 7 (emphasis in original)) Here, Petitioners contend, "[i]t is at least plausible" that such instructions were given (*id.* at 8), and

9

that, as a result, "the Syrian defendants may have direct claims against Respondents." (*Id.* at 9) Those contentions are baseless.

At the outset, Petitioners make no effort to meet their burden of establishing that the originators of the EFTs underlying the Disputed Assets were more than 50% owned by the Syrian government and therefore instrumentalities of Syria. *E.g.*, *Walters v. Indus. & Commercial Bank of China, Ltd.*, 651 F.3d 280, 297 (2d Cir. 2011) (judgment creditors have burden of identifying assets to be executed against and showing that those assets are subject to execution); *Rubin v. Islamic Republic of Iran*, 637 F.3d 783, 785-86 (7th Cir. 2011).[6] Instead, Petitioners state (at 6) that "[t]he blocked EFTs, which include the Disputed Assets, were frozen because OFAC determined the blocked EFTs to be the property of Syria or its agencies or instrumentalities." That is not accurate. JPMCB and BNY Mellon, as noted, not OFAC, blocked the EFTs disclosed to Petitioners in this action, and they did so not because the EFTs were the property of Syria or a Syrian instrumentality, but rather because of the presence in the wire transfer chain of an entity that was then on OFAC's list of Specially Designated Nationals ("SDN"). A party seeking the turnover of a blocked account must do more, to establish that the account is the property of a foreign state or instrumentality thereof, than simply show that the account was blocked pursuant to OFAC regulations. *E.g.*, *Hausler*, 770 F.3d at 211-12 (overruling district court's holding in *Hausler v. JP Morgan Chase Bank, N.A.*, 740 F. Supp. 2d 525, 533 (S.D.N.Y. 2010), "that TRIA's phrase 'blocked assets of that terrorist party' contemplates execution, subject to appropriate turnover proceedings, against all assets blocked pursuant to the CACRs [Cuban sanctions regulations]"). Petitioners accordingly cannot rely on

---

[6] *See also* Statement of Interest filed on July 20, 2016 by the United States Attorney for the Southern District of New York in *Calderon-Cardona v. Deutsche Bank Trust Co. Americas*, No. 11 Civ. 03288 (DLC) (S.D.N.Y.) (ECF. No. 90) at 13 ("Petitioners here bear the burden [under FSIA § 1610] of establishing that the blocked accounts are the property of KFIC [a North Korean entity], that KFIC is an agency or instrumentality of North Korea, and that KFIC engages in commercial activity in the United States.").

the mere fact that an EFT was blocked as proof that the EFT is the property of a Syrian instrumentality.

But even assuming *arguendo* that the originators of the EFTs underlying the BNYM and JPMCB Blocked Accounts were all Syrian instrumentalities, Petitioners' subrogation theory fails in any event as a matter of Second Circuit law. In each of the decisions cited above construing EFTs, the Second Circuit confirmed that an originator has no attachable property interest in an EFT blocked midstream, and that only an originator's bank has such an interest. *See Calderon-Cardona*, 770 F.3d at 1001, 1002 (acknowledging prior decisions holding that neither the originator nor the beneficiary of an EFT has a property interest in a midstream EFT, and holding that "the only entity with a property interest in the stopped EFT is the entity that passed the EFT on to the bank where it presently rests"); *Hausler*, 770 F.3d at 212 (holding the same thing); *Asia Pulp*, 609 F.3d at 119-20 (holding that "the only party with a claim against the intermediary bank is the sender to that bank, which is typically the originator's bank" (internal quotation marks and citation omitted)); *Jaldhi*, 585 F.3d at 71 (holding that "EFTs are neither the property of the originator nor the beneficiary while briefly in the possession of an intermediary bank").

In *Calderon-Cardona* or *Hausler*, the Second Circuit could have cited the subrogation provisions in Article 4-A-402(5) as a possible basis on which an originator, in the context of an enforcement proceeding under TRIA § 201 or FSIA § 1610(g), might have a property interest in a wire transfer blocked midstream. Indeed, in their petition in *Calderon-Cardona* for rehearing en banc, the petitioners specifically argued that the Second Circuit had erroneously failed to account for an originator's subrogation rights under Article 4-A-402(5). (*See* Feigenbaum Decl. ¶11; Ex. 4) But the Second Circuit implicitly rejected that argument by denying the petition. For this or any other district court to uphold such rights now, in the context of proceedings under

11

TRIA § 201 or FSIA § 1610(g), would be to flout the Second Circuit's holdings in *Calderon-Cardona* and *Hausler* by carving out an exception to those holdings that only the Second Circuit or U.S. Supreme Court has the authority to do.

Yet even if Petitioners' subrogation theory were tenable as a legal matter, it would not be as a factual matter. There is no indication, in any wire instructions or otherwise, that the originators of any of the wire transfers underlying the BNYM and JPMCB Blocked Accounts ever instructed their respective originating banks to use BNY Mellon or JPMCB as the intermediary or correspondent bank for those transfers. (Feigenbaum Decl. ¶¶7, 10) Nor is it "plausible" that any of the originators, all Syrian entities, would have issued such a directive. Quite the contrary, it is extremely *implausible* that any of those entities would have done so. Absent concrete evidence that the Syrian originators instructed the originating banks to use BNY Mellon or JPMCB as intermediary banks, those entities have no attachable interest in the BNYM or JPMCB Blocked Accounts. One of the cases cited by Petitioners themselves, *Consub Delaware L.L.C. v. Schahin Eugenharia Limitada*, 676 F. Supp. 2d 162, 168 (S.D.N.Y. 2009), makes that clear:

> [S]ection 402(5) creates rights in those originators that specifically designate the intermediary bank to be used in the transfer. There is no indication that Schahin [the originator of the EFT there at issue] directed that Standard Chartered [the intermediary bank for the EFT] be used in this transfer. As in *Grain Traders* [*Grain Traders, Inc. v. Citibank, N.A.*, 160 F.3d 97 (2d Cir. 1998)], Schahin has no right to sue Standard Chartered for a refund. Accordingly, Schahin has no attachable interest under section 402(5). To hold otherwise would serve only to circumvent the Second Circuit's unambiguous intent [as expressed in *Jaldhi*] to eliminate attachments of EFTs in the hands of intermediary banks in this District. [Emphasis added]

Finally, implicitly acknowledging that the "plausibility" of a possible fact is not enough not establish that fact, Petitioners assert (at 9) that "[s]ince no documents or information have been produced to suggest that the exception to the money-back guarantee does not apply,

12

construing the facts in a light most favorable to Petitioners, the Disputed Assets belong to the Syrian defendants." That is senseless. The absence of the requisite directives in the wire instructions for the EFTs underlying the BNYM and JPMCB Blocked Accounts is, in fact, evidence that the subrogation exception to the money-back guarantee does not apply. (*See* Feigenbaum Decl. ¶¶7, 10.) Regardless, precisely because it is highly implausible that that exception applies here, the only reasonable inference to draw from the absence of evidence one way or the other is that no instructions triggering the exception – to use BNY Mellon or JPMCB as the intermediary bank for the EFTs in question – were ever given.[7]

In sum, Petitioners cannot invoke Article 4-A's subrogation provisions to circumvent *Calderon-Cardona* and *Hausler* or otherwise to establish a right to a turnover of the funds in the BNYM and JPMCB Blocked Accounts.

C. That Lebanese Canadian Bank Was a Party to the Wire Transfer Underlying the Largest of the Blocked Accounts Held by BNY Mellon Is Immaterial Because That Bank Was Never an Instrumentality of Syria

Petitioners next contend that the largest of the Disputed Assets, the blocked account held by BNY Mellon in the amount of $1,194,000, is subject to turnover because the originating bank, Lebanese Canadian Bank ("LCB"), is today defunct, allowing for a "reasonable inference" that the account "belongs to a Syrian defendant" (i.e., Syria Duty Free, the originator of the EFT). That contention, a variation on Petitioners' subrogation argument, is meritless, even assuming Petitioners' account of the facts regarding LCB is accurate.

---

[7] Petitioners cite such cases as *Thurman v. Bun Bun Music*, No. 13 Civ. 5194(CM)(MHD), 2015 WL 2168134, at *3 (S.D.N.Y. May 7, 2015), for the proposition that a defendant's default "is deemed to constitute a concession of all of the well-pleaded allegations in the complaint" pertaining to liability. But that principle does not apply here for the simple reason that Petitioners never pleaded the allegation for which they seek a concession: that the Syrian originators of the blocked EFTs at issue instructed their originating banks to use BNY Mellon or JPMCB as the intermediary bank for those EFTs.

13

Thus, LCB was never a Syrian instrumentality, and since it was the entity that directly transmitted the blocked EFT to BNY Mellon, the EFT is immune from execution under *Calderon-Cardona* and *Hausler*. That LCB was subsequently fined by the Treasury Department, and some or all of its assets sold to Societe Generale, does not change that result or otherwise alter the sole factual inquiry mandated by *Calderon-Cardona* and *Hausler*. Nor does it matter that LCB, which BNY Mellon named as an interpleader respondent in this action and served with its interpleader petition, made no claim to the blocked account.[8] Nothing in *Calderon-Cardona* or *Hausler* suggests that an originating bank's disclaimer of an interest in a blocked EFT automatically shifts the property interest in the EFT to the originator. And there is no evidence, as discussed, that the originator of the EFT, Syria Duty Free, instructed LCB to use BNY Mellon as the intermediary bank for the EFT. Syria Duty Free would accordingly have no subrogation rights even if Second Circuit law recognized such rights in the present context.

D.     This Court Has No Authority to Overrule
       or Disregard *Calderon-Cardona* and *Hausler*

Petitioners' final attempt to circumvent *Calderon-Cardona* and *Hausler* posits that those cases were "wrongly decided" (Petitioners' Br. at 11), principally because, Petitioners say, the "results-oriented opinion" in *Jaldhi* – on which *Calderon-Cardona* and *Hausler* rely in part – "should not have been extended to the TRIA" (*id.* at 12). *Jaldhi*, Petitioners continue, "was concerned with EFTs that briefly pass through New York banks on a daily basis," while this "action deals with funds that have been sitting in New York banks for years." *Id.*

Petitioners' contentions are baseless, however, because this Court is bound by the holdings in *Calderon-Cardona* and *Hausler* and does not have the authority to disregard them.

---

[8] The evidence available to BNY Mellon at the time it served its interpleader petition on LCB in 2014 was that LCB was then still an ongoing, independent entity. (Feigenbaum Decl. ¶5)

*E.g., United States v. Kaczowski*, 114 F. Supp. 2d 143, 166 (W.D.N.Y. 2000) (in response to party's request that "this court . . . find that *Workman* and *Amen* [circuit court decisions] were incorrectly decided," district court noted that party "cites no authority in support of his request," adding that "[d]istrict courts must generally follow the law of their respective circuit" [citing *Ithaca Coll. v. NLRB*, 623 F.2d 224, 227 (2d Cir. 1980)] and "should not, absent convincing grounds to do so, intentionally refuse to follow applicable circuit precedent"). That *Jaldhi* was decided in a commercial context, and *Calderon-Cardona* and *Hausler* in the context of TRIA judgment enforcement proceedings, does not change that fact. The Second Circuit was well aware in *Calderon-Cardona* and *Hausler* that the EFTs at issue in *Jaldhi* passed only briefly through intermediary banks, while those at issue in TRIA cases may be held by intermediary banks for years, as had the North Korean-related accounts involved in *Calderon-Cardona*. (See Feigenbaum Decl. ¶12; Ex. 5 (showing blocked accounts dating back to the 1990s).) But the Court impliedly made clear that the length of time for which an EFT sits with an intermediary bank, whether minutes or years, is irrelevant to the question of to whom that EFT belongs while it is there. Either way, it belongs to the entity that directly transmitted the EFT to the intermediary bank, and this Court has no authority to depart from that principle here.

Petitioners lastly state (at 13) that the blocks on the Disputed Assets will eventually be lifted, and that the funds must then "go somewhere." But the parties can only speculate as to what ultimately may happen to the funds in the blocked accounts at issue here and in other TRIA enforcement proceedings in which blocked accounts are currently not subject to execution under governing law. Under *Calderon-Cardona* and *Hausler*, however, as Petitioners concede (at 13), those funds will "go back to the originating bank," and that is true, as noted, whether or not those

15

banks have disclaimed an interest in the funds. But regardless of what may happen in the future, the funds in the BNYM and JPMCB Blocked Accounts must, for now, stay where they are.

## CONCLUSION

For the foregoing reasons, Petitioners' motion for a turnover of the Disputed Assets, including the BNYM and JPMCB Blocked Accounts, should be denied.

Dated:   New York, New York
         July 22, 2016

LEVI LUBARSKY FEIGENBAUM & WEISS LLP

By: /s/
Steven B. Feigenbaum
Gregory P. Feit
655 Third Avenue, 27th Floor
New York, New York 10017
(212) 308-6100
*Attorneys for Respondents JPMorgan Chase Bank, N.A., JPMorgan Chase & Co. and The Bank of New York Mellon*