UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X
                                      :
PATRICK SCOTT BAKER, et al.,          :
                                      :
                      Petitioners,    :
                                      :
      -versus-                        :  No. 12-cv-7698 (GBD)
                                      :
JPMORGAN CHASE & CO., JPMORGAN        :
CHASE BANK, N.A., CITIBANK, N.A., THE :
BANK OF NEW YORK MELLON, and          :
INTESA SANPAOLO SPA,                  :
                                      :
                      Respondents.    :
                                      :
------------------------------------- X

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PETITIONERS' MOTION FOR TURNOVER OF BLOCKED EFT ASSETS

**STEPTOE & JOHNSON LLP**

Michael Dockterman
115 South LaSalle Street
Suite 3100
Chicago, IL 60603
Tel: (312) 577-1243
Fax: (312) 577-1370

Khristoph Becker
1114 Avenue of the Americas
35th Floor
New York, NY 10036

*Attorneys for Petitioners*

# TABLE OF CONTENTS

I. *Calderon-Cardona* and *Hausler* Do Not Reach the Issue Presented. .................................. 1

II. The Originators of the Disputed Assets Are Agencies or Instrumentalities of Syria. ........ 2

III. The Originating Banks' Default Creates a Direct Link Between the Originators and Respondents and Establishes Petitioners' Superior Claim. .......................................... 4

IV. The Disputed Assets also Are Subject to Turnover Under the Exception to the New York Uniform Commercial Code Article 4A's Money-Back Guarantee. ............. 6

V. Conclusion ................................................................................................................. 10

Petitioners[1] respectfully submit this Reply Memorandum of Law in Further Support of Petitioners' Motion for Turnover of Blocked EFT Assets pursuant to Fed. R. Civ. P. 69(a) and N.Y. C.P.L.R. §§ 5225 and 5227, and under 28 U.S.C. § 1610(g) of the Foreign Sovereign Immunities Act ("FSIA") and Section 201(a) of the Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, 116 Stat. 2322 (codified as a note to 28 U.S.C. § 1610) ("TRIA").

I.  *Calderon-Cardona* and *Hausler* Do Not Reach the Issue Presented.

Respondents JPMorgan Chase & Co., JPMorgan Chase Bank, N.A. (collectively, "JPMorgan"), Citibank, N.A. ("Citibank"), The Bank of New York Mellon ("BNY Mellon"), and Intesa Sanpaolo S.p.A. ("Intesa") argue that "this Court has no authority to overrule or disregard the clear holdings of *Calderon-Cardona* or *Hausler*, which undisputedly control here." (Respondents' Memorandum of Law in Opposition to Petitioners' Turnover Motion ("Opp'n Mem.") at 4.)[2] That is neither what Petitioners seek nor what the Court must reach to allow Petitioners to collect the funds held by the Respondents. *Calderon-Cardona* and *Hausler*—which by their terms seek to protect the rights of banks not present in the proceedings but who may have interests in the funds being sought—do not apply to the funds Respondents hold because: (1) the originating banks have defaulted, Commerzbank has disclaimed its interest, and the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is defunct, all of which creates the direct connection that Respondents argue the Second Circuit requires and establishes Petitioners' superior claim to the Disputed Assets; and (2) the New York Uniform Commercial Code's ("UCC") subrogation provisions apply to the facts in this case.

---

[1]  Patrick Scott Baker, Jerry Baker, Lois Baker, Craig Baker, the Estate of David Baker, Stacie Baker, Patricia A. Henry, the Estate of Scarlett Rogencamp, the Estate of Hetty E. Peterson, Valerie Peterson, the Estate of Vernon W. Peterson, Katharine D. Doris, Paul G. Peterson, Michelle Y. Holbrook, Jackie Nink Pflug, the Estate of Rylma Nink, Eugene Nink, Gloria Nink, Mary Nink, and Scott Pflug.

[2]  Respondents' Opposition was submitted by JPMorgan and BNY Mellon, and joined by Citibank and Intesa. (Declaration of Sharon Schneier ("Schneier Decl.") ¶ 2; Declaration of Gina Cora ("Cora Decl.") ¶ 1.)

*Calderon-Cardona* and *Hausler* teach that the Disputed Assets must flow back up the UCC chain, and that Petitioners must establish their right to the funds at each link in that chain. For the reasons detailed in their opening brief, Petitioners have shown that their claims are superior to the preceding banks for each of the blocked EFTs that became Disputed Assets; and, in all events, the UCC's subrogation provisions give Petitioners priority over those banks. To hold otherwise would be to say that Respondents keep these funds forever, something even Respondents concede *Calderon-Cardona* and *Hausler* do not instruct.

## II. The Originators of the Disputed Assets Are Agencies or Instrumentalities of Syria.

Respondents quizzically contend that Petitioners' motion should be denied because Petitioners insufficiently alleged in their brief that the originators of the Disputed Assets were agencies or instrumentalities of Syria. (Opp'n Mem. at 2-3.) That issue, however, has been settled and need not be relitigated.[3] Accordingly, Respondents stipulated in the joint letter pursuant to which the Court granted this briefing schedule that the originators of the disputed assets are agencies or instrumentalities of Syria. (June 10, 2016 Joint Ltr. at 2, Dkt. No. 423 ("The parties disagree . . . over the status of the following assets, totaling $1,628,890.89, *where the originator*, but not the originator's bank, *is an agency or instrumentality of Syria*." (emphasis added)).) Petitioners tracked that language in their opening brief. (Petitioners' Memorandum at 4 ("Petitioners disagree, however, over the status of approximately $1.6 million of assets, where

---

[3] In their first turnover motion, Petitioners established that the originators of all of the Disputed Assets are agencies or instrumentalities of Syria. (*See* Petition for Turnover ("First Turnover Pet."), Dkt. No. 1.) At Respondents' request, the Court authorized Respondents to file interpleader motions to give each of the parties to the wire transfers an opportunity to claim an interest in the blocked EFTs, including the Disputed Assets. (*See* March 6, 2014 Order Setting Forth Procedures for Interpleader Actions and Turnover Motions ¶ 23, Dkt. No. 83.) Respondents' interpleader motions also served the purpose of "[d]etermining whether any of the [parties to the wire transfers] are an agency or instrumentality of Syria." (JPMorgan's Amended Third-Party Petition ¶ 58(c), Dkt. No. 345.) None of the parties to the Disputed Assets, including the originators, claimed an interest in the blocked EFTs or challenged their agency or instrumentality status.

2

the originator, but not the originator's bank, is an agency or instrumentality of Syria . . . .").) The originators' agency or instrumentality status is therefore the law of this case.

Nevertheless, for the Court's convenience, the details of the transactions are as follows:

- ▇▇▇ transferred on April 5, 2011 from ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇[4] (blocked by JPMorgan).

- ▇▇▇ transferred on August 31, 2011 from ▇▇▇▇▇▇▇▇▇[5] (blocked by JPMorgan).

- ▇▇▇ transferred on August 30, 2011 from ▇▇▇▇▇▇▇▇▇.[6] (blocked by Intesa).

- ▇▇▇ transferred on September 12, 2011 from ▇▇▇▇▇▇▇[7] (blocked by Citibank).

- ▇▇▇ transferred on September 7, 2011 from ▇▇▇▇▇▇▇[8] (blocked by Citibank).

- ▇▇▇ transferred on April 16, 2010 from ▇▇▇▇▇▇▇[9] (blocked by BNY Mellon).

- ▇▇▇ transferred on March 30, 2010 from ▇▇▇▇▇[10] (blocked by BNY Mellon).

---

[4] ▇▇▇▇▇▇▇▇▇▇ is either synonymous with or a subsidiary of ▇▇▇ which is on the Office of Foreign Assets Control's ("OFAC") State Designated Nationals List ("SDN List"), (First Turnover Pet. ¶ 25), or ▇▇▇▇▇▇▇▇▇▇ "a wholly state-owned telecommunications company that has already been ruled an agency or instrumentality of Syria . . . ." (*Id.* ¶ 21 (citing *Gates v. Syrian Arab Republic*, No. 11-8715 (N.D. Ill.), Dkt. No. 74, at 10-12).)

[5] ▇▇▇▇▇▇▇▇▇▇ is either a subsidiary of ▇▇▇▇▇▇▇▇▇▇GPC"), which is on the SDN List, or a joint venture between ▇▇▇ and ▇▇▇ in which ▇▇▇ owns at least a 50% share. (*Id.* ¶ 24.)

[6] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ s owned in part by ▇▇▇ which is wholly-owned by Syria and is on the SDN List. (*Id.* ¶ 38.) Intesa contends, however, that "▇▇▇ cannot be considered an agency or instrumentality of Syria . . . even if ▇▇▇ were found to have more than a 50% ownership interest in ▇▇▇ (Cora Decl. ¶ 5 (citing *Dole Food Co. v. Patrickson*, 538 U.S. 468, 473-74 (2003)).) But Congress overruled *Dole*'s application here by enacting § 1610(g). (*See* Dockterman Decl. ¶ 3, Exhibit A (Statement of Interest of the United States (at 15-16) filed in *Estate of Heiser, et al. v. Islamic Republic of Iran*, No. 00-2329 (D.D.C. Aug. 3, 2012), Dkt. No. 230)); *Calderon-Cardona v. JPMorgan Chase Bank, N.A.*, 867 F. Supp. 2d 389, 406-07 (S.D.N.Y. 2011), *rev'd in part on other grounds*, 770 F.3d 993 (2d Cir. 2014).

[7] ▇▇▇▇▇▇▇▇ s on the SDN List and wholly-owned by Syria. (First Turnover Pet. ¶ 30.)

[8] *Id.*

[9] ▇▇▇▇▇▇▇ is on the SDN List. (*Id.* ¶¶ 33-34.)

And even were that not the law of this case, because the originators never appeared to contest their agency or instrumentality status—a point conceded by Respondents—Petitioners easily meet their low burden of establishing (once again) their right to these funds. *See Thurman v. Bun Bun Music*, No. 13-5194, 2015 WL 2168134, at *3 (S.D.N.Y. May 7, 2015) ("A defendant's default is deemed to constitute a concession of all of the well-pleaded allegations in the complaint . . . and establishes a defendant's liability if those allegations are sufficient to state a cause of action against the defendant.") (citing *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992); *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009)).

### III. The Originating Banks' Default Creates a Direct Link Between the Originators and Respondents and Establishes Petitioners' Superior Claim.

Respondents next argue that the Disputed Assets are not subject to turnover because Syria, or its agencies and instrumentalities, did not "directly" transfer the Disputed Assets to Respondents. (Opp'n Mem. at 7-8.) That is true but not determinative; the proper time to determine the originating banks' ownership rights is when the Court issues a turnover order, not when the funds were first blocked. *Cf. Pacnav S.A. v. Effie Bus. Corp.*, 909 N.Y.S.2d 880, 882 (N.Y. Sup. Ct. 2010) (explaining that, in issuing an order of attachment to EFTs, the court "exerted *quasi in rem* jurisdiction over [the party] based on its property . . . within the District"). Respondents do not contest that the Disputed Assets, which are all that Petitioners seek, were properly frozen, *i.e.*, were Syrian assets at the time they were blocked. After the EFTs were transferred and blocked, the originating banks who *might* have made a claim on the funds defaulted in this action—taking themselves out of the UCC chain. By defaulting on the interpleader *brought by Respondents*, those originating banks waived whatever ownership rights

---

[10] ▮▮▮▮▮ is owned by the ▮▮▮▮▮ (*id.* ¶ 35), members of which are on the SDN List. (*Id.* ¶ 25).

the UCC conferred upon them (as *Calderon-Cardona* and *Hausler* hypothesized). Petitioners therefore have a superior claim to the originating banks—and any other claimant—on those Disputed Assets.

The same logic applies to ▮ with even greater force. BNY Mellon states that the $1.2 million EFT is "immune from execution" because ▮ was never a Syrian instrumentality. (Opp'n Mem. at 13-14.) Petitioners do not contend, however, that ▮ was an instrumentality of Syria, or at least not that it was on the SDN List, nor do they need to do so to prevail. What matters is whether ▮ has a claim to any of the Disputed Assets *today*. ▮ certainly does not because it is defunct. On this record, there is no bank between BNY Mellon and the originator of that transaction (separate and apart from the link created by ▮ failure to appear to defend this action) whose claim under the UCC to the Disputed Assets is superior to Petitioners' lien.

Intesa separately contends that it stands in a different position from the other Respondent banks because it was further downstream from the originator of the disputed transaction, *i.e.*, Commerzbank AG was Intesa's immediately preceding intermediary. (*See* Cora Decl. ¶¶ 6-8.) But Commerzbank disclaimed its interest in the blocked EFT that Intesa holds, placing Intesa in exactly the same position as the other Respondent banks: effectively proximate to the originating bank of the Syrian EFT.[11] (Dockterman Decl. ¶ 4, Exhibit B.) Moreover, the Disputed Assets blocked by Intesa are clearly held in the originator's name, which, as the United States noted in

---

[11] Anticipating Petitioners' argument, Intesa claims that Petitioners have waived their disclaimer argument. (Cora Decl. ¶ 9 ("While Petitioners do not advance this argument in their moving papers (and thus have waived it), they have, in correspondence with me, argued that Commerzbank AG has disclaimed its interest in the blocked proceeds at issue.").) Petitioners, however, were not required to argue that Commerzbank disclaimed its interest unless and until Intesa raised its "special treatment" argument first. Petitioners' disclaimer argument is a defense, not a claim, and it establishes Petitioners' superior right to these Disputed Assets. Likewise, contrary to Intesa's interpretation of the Cuban Asset Control Regulations ("CACR") and the Syrian Sanctions Regulations ("SSR"), (Cora Decl. ¶¶ 10-11), the CACR and SSR's prohibitions on transferring assets to sanctioned countries mean that, as in *Vera v. Republic of Cuba*, No. 12-1596 (S.D.N.Y. Sept. 24, 2015) (Hellerstein, J.), discussed *infra*, when a court orders turnover, those assets must go to the judgment debtors.

its Statement of Interest in *Calderon-Cardona*, creates a presumption that the originator owns the assets. (Schneier Decl., Ex. 1 at 16 ("The record also does not reflect the account names under which the blocked accounts are held; this could bear on the ownership of the accounts, as courts in this Circuit have noted that 'under New York law, an account is presumed to be the property of the entity in whose name it is held.'") (quoting *Villoldo v. Ruz*, No. 14-0025, 2016 WL 81492, at *15 (N.D.N.Y. Jan. 7, 2016); citing *Karaha Bodas Co., LLC v. Pertamina*, 313 F.3d 70, 86 (2d Cir. 2002)).) Intesa lists "▬▬▬▬▬▬▬▬▬▬▬▬▬▬" as the "Holder" of the Blocked Asset, (May 21, 2012 Ltr. from Intesa to Silverman at 1, First Turnover Pet. ¶ 38, Ex. T (Dkt. No. 1)), settling this argument in Petitioners' favor.

Intesa also says that Commerzbank's disclaimer is void under *Martinez v. Republic of Cuba*, No. 07-6607 (S.D.N.Y. 2015), (Cora Decl. ¶¶ 10-11), eliding the fact that the *Martinez* court denied turnover on other grounds, and expressly did not decide the disclaimer issue. *See id.* at 24-26 (distinguishing *Vera*, which the plaintiff in *Martinez* relied on for a disclaimer argument, because unlike *Vera* there was no indication that the originator was a Cuban entity, rendering the disclaimer issue moot). Notably, in *Vera*, Judge Hellerstein held that the EFTs *must* be turned over to the plaintiffs because, as here: (1) no other party had asserted an interest in the funds, and (2) the funds could not be released to Cuba or a Cuban entity. *Vera* therefore supports the conclusion that Commerzbank's disclaimer, coupled with the originating banks' default, creates the very link Respondents say is required by *Calderon-Cardona* and *Hausler*. *See id*.

IV. **The Disputed Assets also Are Subject to Turnover Under the Exception to the New York Uniform Commercial Code Article 4A's Money-Back Guarantee.**

Respondents claim that Petitioners' subrogation argument has no merit because (1) it was not recognized by *Calderon-Cardona* or *Hausler*, and (2) there is no evidence that the

6

originators identified the intermediary bank to be used for the transaction in question. (Opp'n Mem. at 3.) The argument reveals an interesting aspect of Respondents' refusal to release the Disputed Assets: they take polar opposite positions when it helps them retain funds.

For example, Respondents state that "the Second Circuit could have cited the subrogation provisions in Article 4-A-402(5) as a possible basis on which an originator . . . might have a property interest in a wire transfer blocked midstream." (*Id.* at 11.) Respondents continue that, "in their petition in *Calderon-Cardona* for rehearing en banc, the petitioners [in *Calderon-Cardona*] specifically argued that the Second Circuit had erroneously failed to account for an originator's subrogation rights under Article 4-A-402(5). But the Second Circuit implicitly rejected that argument by denying the petition." (*Id.*) Yet Respondents said the exact opposite in their opposition to the plaintiffs' Petition for Writ of Certiorari in *Calderon-Cardona*, arguing that there was no conflict between the D.C. Circuit's opinion in *Estate of Heiser* and the Second Circuit's opinion in *Calderon-Cardona*:

> This case is a poor vehicle to resolve this purported conflict because *it does not involve subrogation rights*. The Petitioners *never alleged* that the judgment debtor North Korea owned any of the blocked EFTs by virtue of *the subrogation provision of the UCC*.
>
> Moreover, despite objections from the Respondents, the Second Circuit remanded this case for further factual discovery. As a result, *there is no final determination from the Second Circuit on what interests North Korea has in the blocked EFTs* (as originator, beneficiary, *subrogee* or otherwise).

*Calderon-Cardona, et al. v. The Bank of New York Mellon, et al.*, No. 15-122, 2015 WL 9184792, at *16 (U.S. Dec. 16, 2015) (Brief for the Respondents in Opposition) (emphasis added). As the *Calderon-Cardona* plaintiffs rightly state in their recent reply in support of their motion to compel discovery, Respondents are judicially estopped from taking the opposite

position after having prevailed when the Supreme Court denied cert in *Calderon-Cardona*. (Dockterman Decl. ¶ 5, Exhibit C at 4-5.)

In any case, the denial of a petition for rehearing *en banc* is of little, if any, precedential value. Federal Rule of Appellate Procedure 35 explains that *en banc* review "is not favored and ordinarily will not be ordered unless: (1) en banc consideration is necessary to secure or maintain uniformity of the court's decisions; or (2) the proceeding involves a question of exceptional importance." Fed. R. App. P. 35(a)(1)-(2). It certainly does not set precedent. *See United States v. Bert*, 814 F.3d 591, 594 (2d Cir. 2016) (Jacobs, *C.J.*, joined by Cabranes, Raggi, and Livingston, *C.Js.*, dissenting from denial of rehearing *en banc*) (explaining that petitions for rehearing *en banc* have been denied because the appeal is "too complicated, or not important enough, or too important"). Subrogation therefore remains a valid theory of recovery.

As to the facts, Respondents state that "[t]here is no indication, in any wire instructions or otherwise, that the originators of any of the wire transfers . . . ever instructed their respective originating banks to use [Respondents] as the intermediary or correspondent bank for those transfers." (Opp'n Mem. at 12.) Respondents continue: "Nor is it plausible that any of the originators, all Syrian entities, would have issued such a directive. Quite the contrary, it is extremely *implausible* that any of those entities would have done so." (*Id.*) Respondents also cite *Consub Delaware L.L.C. v. Schahin Eugenharia Limitada*, 676 F. Supp. 2d 162 (S.D.N.Y. 2009) for support.

First, *Consub* recognizes that the exception to the money-back guarantee "creates rights in those originators that specifically designate the intermediary bank to be used in the transfer." *Id.* at 168. Although there was "no indication that Schahin directed that Standard Chartered be used in this transfer," *id.*, there is such an indication here. Unlike in *Consub*, it is highly likely

8

that the originating banks knew the assets would be blocked because, not only were the assets transferred from Syria to the United States, but they were also sent from originators *on OFAC's SDN List*. Since Respondents had a legal obligation to block such EFTs, it is beyond plausible that the originating banks protected themselves by shifting the risk of loss onto the originators in the way that the UCC, the Model Law on International Credit Transfers ("MLICT"),[12] and *Consub* recognize. Otherwise the originating banks effectively would have guaranteed the originators large refunds that the Syrian banks could not recoup until sanctions are lifted or a license is obtained. It is reasonable to infer that the originating banks made economically rational decisions. *Cf. New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC*, 709 F.3d 109, 121 (2d Cir. 2013) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554 (2007)).

Second, the supposedly unique nature of EFTs that Respondents have elaborately described demonstrates why there would be no record of recommended transmittal in a wire transfer between an originating bank and its intermediary. (*See* Opp'n Mem. at 7.) If EFTs are viewed as separate transfers that create contractual property rights only between the originator and the originating bank, the originating bank and its intermediary bank, and the beneficiary's bank and the beneficiary, then it makes sense that the only entity with information specifically designating a route would be *the originating bank*.

Because the originating banks defaulted, the Court must resort to inferences, which Petitioners have plausibly alleged.[13] Under Article 14(3) of the MLICT:

---

[12] (Dockterman Decl. ¶ 6, Exhibit D.) The MLICT was adopted by the United Nations Commission on International Trade Law ("UNCITRAL") and "live[s] together in harmony" with UCC Article 4A. Permanent Editorial Board Commentary No. 13, U.C.C. Rep. Serv. 2d (Feb. 16, 1994).

[13] Respondents dispute that the plausibility standard applies "for the simple reason that Petitioners never pleaded the allegation for which they seek a concession: that the Syrian originators of the blocked EFTs at issue instructed their originating banks to use [Respondents] as the intermediary bank for those EFTs." (Opp'n Mem. at

> A receiving bank[14] is not required to make a refund . . . if it is unable to obtain a refund because an intermediary bank *through which it was directed* to effect the credit transfer has suspended payment or is prevented by law from making the refund. . . . The sender[15] *that first specified* the use of that intermediary bank has the right to obtain the refund from the intermediary bank.

(Dockterman Decl. ¶ 6, Exhibit D, art. 14(3) (emphasis added).) As the UNCITRAL secretariat explains:

> A credit transfer may fail because . . . the State has issued an embargo on transfers . . . . In such a situation a bank, and particularly an originator's bank, may refuse to accept the payment order unless it is directed by its sender to use a particular intermediary bank to complete the credit transfer. Where a receiving bank is directed to use a particular intermediary bank and it is unable to obtain a refund from the intermediary bank because that bank has suspended payment or is prevented by law from making the refund, the receiving bank is not required to make a refund to its sender.

(*Id.* at Explanatory Note 42.) Because the exception to the money-back guarantee is well-recognized internationally, and given the likelihood that originating banks protect themselves in accordance with the MLICT's provisions, Petitioners have made out a plausible claim for relief.

## V. Conclusion

For the foregoing reasons, as well as those set forth in Petitioners' opening papers here and first turnover petition in this action, Petitioners respectfully request that the Court grant their Motion for Turnover of Blocked EFT Assets.

---

13 n.7.) But Petitioners did specifically plead that the Disputed Assets should be turned over under TRIA and § 1610(g) of the FSIA, and that the originators are agencies or instrumentalities of Syria. The only reason Petitioners did not mention subrogation in their first turnover petition is because *Calderon-Cardona* and *Hausler* had not yet been decided.

14      In this case, the "receiving bank" is the originator's bank. (Dockterman Decl. ¶ 6, Exhibit D, art. 2(f) (defining "receiving bank" as "a bank that receives a payment order").)

15      Here, the "sender" means the originator. (*Id.* at art. 2(e).)

Dated:   New York, New York
         August 5, 2016

           Respectfully submitted,

           <u>s/ Michael Dockterman</u>
           Michael Dockterman
           STEPTOE & JOHNSON LLP
           115 South LaSalle Street
           Suite 3100
           Chicago, IL 60603
           Tel:  (312) 577-1243
           Fax:  (312) 577-1370

           Khristoph Becker
           1114 Avenue of the Americas
           35th Floor
           New York, NY 10036

           *Attorneys for Petitioners*